IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:08CR3059 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| JAYRO A. FLORES and JULIO | ) | REPORT AND RECOMMENDATION |
| FLORES-ELENES, | ) | |
| | ) | |
| Defendants. | ) | |

Both defendants have filed motions to suppress evidence. Defendant Julio Flores-Elenes (hereinafter, "Julio") has moved to suppress all physical evidence and statements obtained from him as a result of a traffic stop and search of his vehicle on April 21, 2008 which he argues violated his rights under the Fourth Amendment. Defendant Jayro Flores (hereinafter "Jayro") has moved to suppress statements he made to Nebraska State Patrol Investigator Jeff Shelton following Jayro's arrest in connection with that traffic stop, which, he argues, were taken in violation of his rights under the Fifth Amendment and Miranda v. Arizona, 384 U.S. 436 (1966).

An evidentiary hearing was held on these motions on July 18, 2008 before the undersigned. I now recommend that defendant Julio's motion be denied, and that defendant Jayro's motion be granted.

FACTS -- THE STOP AND SEARCH

On April 21, 2008 Nebraska State Patrol Trooper Paul Hazard was in his patrol cruiser, which was stationary in the median of Interstate Highway 80 in Buffalo County, Nebraska, facing southwest. He was running radar on eastbound traffic. The speed limit in that area is 75 mph. Traffic was light. Hazard had tested his radar unit before his shift began that day at 3:00 p.m. and had found it to be operating correctly. At about 7:00 p.m. Hazard noticed an eastbound vehicle which he believed to be speeding. He activated his radar antenna and the radar indicated that the vehicle was traveling at 81 mph. As the vehicle passed him he noticed that it did not have a front license plate.[1] He pulled onto the highway and stopped the vehicle.

The vehicle stopped without incident. It was a white 2005 Chrysler Pacifica driven by defendant Julio and also occupied by defendant Jayro. The events were recorded on the in-car video camera in the trooper's vehicle. Exhibit 1. Trooper Hazard approached the vehicle on the passenger side and requested the driver's license and the vehicle registration. He requested that the driver accompany him to his cruiser so a warning citation could be completed.[2] While the driver, later identified as Julio,

---

[1] Trooper Hazard testified that after he pulled onto the roadway and saw the rear plate of the vehicle was from Indiana, he believed that Indiana required both front and rear license plates. He so advised the driver later when he stopped the vehicle. However, he subsequently learned Indiana requires only a rear license plate. This mistake of law played no part in his reason for stopping the vehicle, however, which was for a speeding violation.

[2] The entire conversation was in English. Although Jayro clearly spoke English fluently, Julio did not. Several times Trooper Hazard had to either repeat questions or use Spanish

stepped to the cruiser, Trooper Hazard asked the passenger about the origin and purposes of their trip. Jayro told the trooper they had started in Phoenix and that they were heading to Indiana. He also answered that he was in Phoenix painting, and that Julio lived in Indiana.

In the trooper's vehicle he asked Julio if he had any American identification, and Julio answered he did not. Julio also said they were coming from Phoenix where he had worked and visited his children. He told the trooper the owner of the Pacifica was James Jackson, a friend from Indiana. Answering the trooper's question as to whether he had driven to Phoenix, Julio said, "Yeah." He also said James had loaned him his car so he could go to Phoenix, he'd been in Phoenix about ten days, and the purpose of the trip was to work and see family. He was going to Indiana to paint houses until winter, when he would go back to Phoenix. He identified his passenger as Jayro Antonio Flores, which matched the name on the identification which Jayro had provided the trooper, and said Jayro was Julio's nephew. He also gave the trooper an address in Phoenix where he said he had lived.

The trooper called his dispatch to request information on the two occupants, using their identification information. He also completed the speeding warning citation. Trooper Hazard asked Julio how long he intended to stay in Indiana, and Julio answered two months. In answer to the trooper's question about how Jayro

---

words to convey to Julio the meaning of his inquiry. Although Trooper Hazard testified that Julio fairly understood English, the evidence does not support his conclusion in that regard, particularly considered in light of Trooper Hazard's very fast speech pattern. Nevertheless, the evidence does support a conclusion that Julio, with great, labored effort, eventually understood at least most of what Trooper Hazard said or asked. See discussion regarding consent form, *infra*.

was going to return to Phoenix, Julio said he would "fly, I think, maybe. . ." but was not permitted to complete his answer before Trooper Hazard asked another question.  Julio also said that they were sleeping in motels and had last stopped in Colorado.

Trooper Hazard told Julio he was going to return Jayro's identification; he then exited the cruiser and re-approached the Pacifica on the passenger side.  There, he asked Jayro how long they intended to stay in Indiana.  The answer was inaudible on the recording, but the trooper testified that Jayro answered that they were going to be in Indiana just a couple days, and they were then going to drive back to Phoenix.  Jayro said he helped his uncle, Julio, but they were not in a business together.  He didn't know how the car had gotten to Phoenix.

Trooper Hazard returned to the cruiser and asked Julio if he had been arrested before, to which Julio answered that he had not.  However, dispatch informed the trooper immediately after this exchange that Julio had a "positive triple I," meaning he had a prior arrest for some sort of controlled substances violation.  Julio's answer that Jayro had not been arrested was confirmed by the information radioed from dispatch.

Julio stated that he thought he was traveling at 78 mph, and asked if he'd been traveling 81, which the trooper confirmed.  The trooper then returned the documentation to Julio and told him to "Have a nice day."  Julio then began to exit the cruiser.  Nearly eleven minutes had elapsed from the beginning of the traffic stop.

Trooper Hazard asked Julio, "Hey, you got one minute?"  Although there is no audible response on the recording, the trooper testified that Julio sat back down in the cruiser and shut the

4

door, and a sound resembling the closing of a car door can be heard on the recording. Trooper Hazard stated that "one of the things" the State Patrol does is "criminal interdiction." He asked Julio again how long he was going to be in Indiana, and again Julio answered until the snow comes, a couple of months or so as he couldn't get work there in the winter. Trooper Hazard asked Julio if he'd been arrested for a DUI, to which he responded no. When Trooper Hazard then stated that Jayro had told him they were staying in Indiana only two days, Julio said that Jayro was wrong and, with a laugh, "maybe he scared," perhaps implying that Jayro may be scared because Julio is not an American citizen.

A that point Trooper Hazard asked Julio if he had any weapons in the car, to which Julio answered "no." Then the trooper asked whether there were any drugs in the car, and Julio answered "no." Trooper Hazard then asked individually whether there was any marijuana, cocaine, heroin, or methamphetamine in the car, and Julio answered "no" to each question. Trooper Hazard then said, "Can I search your vehicle? Can I search your car?" Julio answered "Yeah."[3] Trooper Hazard immediately presented Julio with a consent-to-search form provided by the Nebraska State Patrol,

---

[3] The tone in which "yeah" was stated would indicate that it was a question, that is, there is a rise in pitch at the conclusion of this one-syllable word. In addition, the word is stated more loudly and more clearly than the prior answers given by Julio that are audible on the recording. Thus, the recorded word could be interpreted as the trooper responding to the defendant's answer, which answer was itself not audible, confirming an affirmative answer. In response to the court's questioning of Trooper Hazard on this issue, he stated that the voice on the recording saying the word was not his voice. This testimony was credible. In either event, however -- whether the voice is the defendant's or the trooper's confirming defendant's affirmative answer -- it is highly unlikely that, had the defendant answered anything but affirmatively, the trooper would have proceeded to the execution of the consent form.

5

Exhibit 4, and began reading it to him aloud. When that was done, Julio signed the form, and Trooper Hazard's search of the vehicle began, eventually yielding the contraband at issue in this case and the defendants' arrests.

LEGAL ANALYSIS -- THE STOP AND SEARCH

"Any traffic violation, however minor, provides probable cause for a traffic stop." <u>United States v. Payne</u>, ___F.3d ___, 2008 WL 2853205 (8th Cir. 2008), citing, <u>United States v. Bloomfield</u>, 40 F.3d 910, 915 (8th Cir. 1994) (en banc). The evidence clearly establishes that defendant Julio Flores-Elenes was speeding. He admitted that he had his cruise control set at 78 mph, and the trooper's radar unit "locked" on his vehicle going 81 mph. The traffic stop did not violate the Fourth Amendment.

Further, Trooper Hazard did not unlawfully expand the traffic stop.

> After stopping a vehicle, an officer has the authority to ask the driver what his or her destination and purpose is, check the driver's license and registration, or request that the driver step out of the vehicle. <u>United States v. Linkous</u>, 285 F.3d 716, 719 (8th Cir. 2002). A traffic stop can last as long as reasonably necessary to conduct this routine investigation, conduct a criminal history search, and issue a citation. <u>United States v. Jones</u>, 269 F.3d 919, 924-25 (8th Cir. 2001). If this routine investigation raises the officer's suspicions and the officer has reasonable, articulable suspicion, the officer may expand the scope of the investigation. <u>United States v. Allegree</u>, 175 F.3d 648, 650 (8th Cir. 1999).

Payne, slip op at \_\_\_\_\_. Trooper Hazard's questioning of the occupants of the Pacifica did not exceed the parameters allowed in these circumstances, in either subject matter or time elapsed.

According to the time notations on Exhibit 1, Trooper Hazard took less than eleven minutes to complete the citation, check the vehicle registration and the occupants' identifications and criminal history information. These were routine investigations common to all traffic stops. There was no evidence of any deliberate delays in Trooper Hazard's inquiries and his communications with his dispatcher. Once he received the requested information from dispatch, he immediately completed the citation and concluded the stop with "Have a nice day."

Nor did his questions go beyond the origin, destination and purpose of the trip, together with appropriate follow-up questions. During his conversation with the occupants, he received only slightly conflicting information from Jayro and Julio: The length of their intended stay in Indiana (two days versus two months); and whether Julio had been previously arrested (Julio said no, but dispatch said yes).[4] In nearly all other respects the information gained during the conversation was consistent as between the two of them. Both Julio and Jayro said they were coming from Phoenix; both had Phoenix addresses; both said they were going to Indiana, to paint houses; both said their relationship was uncle-nephew; Julio knew Jayro's complete name; both knew the name of the owner of the vehicle; Julio correctly stated that Jayro had no prior

---

[4] Although Trooper Hazard testified that Julio could not give him an answer to his question of how the vehicle got to Phoenix from Indiana, this was incorrect, as Julio did answer that he had driven the vehicle to Phoenix. Exhibit 1. This did not conflict with Jayro's answer, as he stated he did not know how the vehicle got there.

7

arrests.  The discrepancies when considered together in the totality of the circumstances, did not add up to reasonable suspicion to detain the defendants further, and Trooper Hazard promptly, and wisely, concluded the traffic stop.

Even though a law enforcement officer does not have reasonable suspicion to detain a motorist following a traffic stop, that fact does not preclude the officer from asking the driver to converse with the officer further.

> Law enforcement officers do not violate the Fourth Amendment by asking a person for consent to search or other types of cooperation, even when they have no reason to suspect that person, "provided they do not induce cooperation by coercive means."  United States v. Drayton, 536 U.S. 194, 201 (2002); see United States v. Jones, 269 F.3d 919, 925 (8th Cir. 2001).  That being so, the time it takes for an officer to find out if consent will be given cannot be an unlawful detention in the absence of coercive or otherwise unusual circumstances.

Unites States v. Yang, 345 F.3d 650, 654 (8th Cir. 2003).  After Trooper Hazard concluded the traffic stop, he permitted Julio to begin to exit the patrol vehicle and be on his way before asking him if he would take "one minute" more.  Julio's aborting his exit and sitting back down in the passenger seat was reasonably interpreted by the trooper as consenting to additional conversation.  Although asking for only "one minute" more was deceptive, it was not so much so as to amount to "coercive" circumstances.  There were no other unusual circumstances present, and Hazard's request for consent to search was made during this very brief consensual extension of the encounter.  There was no violation of the Fourth Amendment in asking Julio to continue to converse with the officer.

Nor were there other circumstances which would render Julio's consent to search the vehicle involuntary. He willingly answered the trooper's questions about whether the vehicle contained contraband, and he responded immediately and affirmatively to the question, "Can I search your vehicle? Can I search your car?" His consent thus given was voluntary and untainted by any coercive or other circumstances. The consensual search that followed did not violate the Fourth Amendment.[5]

---

[5] That said, it must be observed that absent the clear evidence of the defendant's verbal consent, there is inadequate evidence to establish that the defendant's *written* consent was knowing and voluntary. It is abundantly clear from the recording that a reasonable officer would have known from the outset of the conversation that Julio's primary language was Spanish. Yet, the consent-to-search from used by the trooper was in English and contains several words beyond what might be considered "beginner" English vocabulary, such as "voluntarily," "authorize," and "assistance." The form was read to Julio very quickly, and the trooper did not inquire as to Julio's understanding of the words in the form (as he had done at times during the preceding conversation) nor his ability to read English.

The Nebraska State Patrol has used Spanish language consent-to-search forms (as well as occasionally live interpreters) many times in prior cases before this court, so it is clear such forms are or can be available to its troopers. In literally hundreds of prior cases in this court which have involved transporting illegal drugs on I-80, many, if not a majority, of the defendants have been persons whose primary language is Spanish. It is plainly foreseeable that many more such persons may be involved in traffic stops conducted by the Nebraska State Patrol in the future. Although it did not abrogate the verbal consent given in this case, failure of the Nebraska State Patrol to use Spanish language consent-to-search forms seriously impedes this court's ability to find a "knowing" and "voluntary" consent to an ensuing search of a vehicle, and thus jeopardizes future cases.

# FACTS —- THE INTERVIEW

Defendant Jayro Flores was later taken to an interview room at the Kearney, Nebraska office of the Nebraska State Patrol. NSP Investigator Jeff Shelton attempted to interview Jayro about the incident. These events were videotaped and the tape of the conversation was received as Exhibit 2. Jayro declined the interview, but not before he had answered some questions put to him by Shelton.

The videotape shows the following. Defendant was already in the room when Investigator Shelton entered the room. Shelton asked the defendant for identification, and defendant responded that it was in his wallet with Trooper Hazard. Shelton asked defendant's name, and Jayro responded, spelling it, whereupon Shelton introduced himself, shook the defendant's hand, and identified himself as an investigator with the Nebraska State Patrol. Shelton asked for and the defendant gave his street address in Phoenix. The following then took place:

> Shelton: Well, I'm assuming you probably know the reason that you're in here. Do you know why you've been arrested?
>
> Defendant: [After looking down for a second or two] Yes, sir.
>
> Shelton: Just another quick question. I'm assuming the car out there [pointing over his shoulder] -- it belong to him, the other guy?
>
> Defendant: No.
>
> Shelton: Who does it belong to?
>
> Defendant: James Jackson.
>
> Shelton: That's a real name?
>
> Defendant: From what I know of, yes.

10

    Shelton:  Is James in the Service?

    Defendant:  I don't know.

    Shelton:  There's an Army sticker on the back window and a supporter sticker on the back license plate.  Do you know James at all?

    Defendant:  No I don't.

    Shelton:  You don't know him at all?  Does this guy out here know him?

    Defendant:  I don't know.

    Shelton:  Is this your uncle?

    Defendant:  That's right.

    Shelton:  So you don't know anything about James?

    Defendant:  [inaudible].

Exhibit 2, at elapsed times 1:00-2:07.  Then Investigator Shelton put down his writing utensil and discussed an "opportunity" for Jayro to "help yourself" by providing information to the Nebraska State Patrol.  After Jayro declined and asked about his rights, Shelton responded that he hadn't asked defendant anything incriminating so there was no need to advise him of his rights.  Shelton suggested that the defendant consider whether he had anything he wanted to tell the investigator, and, in response to Jayro's question about retrieving his cell phones, said, ". . . I guarantee you, we can find a lot of stuff out from your cell phones, so if you have anything to tell me, you'd better think about it now.  I'll give you a few minutes."  Id. at 4:58.  The conversation then ended, only five minutes after it began, with Shelton leaving the room.

LEGAL ANALYSIS -- THE INTERVIEW

The government agrees with the defendant that he was "in custody" as that term is used in Miranda v. Arizona, 384 U.S. 436, 444-45 (1966), and further agrees that defendant did not receive Miranda warnings prior to any of the statements in dispute. The governments claims, however, that the questions asked were simply "biographical," and not incriminating, while the defendant argues that they were and were intended to be incriminating under Rhode Island v. Innis, 446 U.S. 291 (1980). Defendant has not raised the "voluntariness" of the conversation or of the statements made as an issue to be resolved.

The Supreme Court has held that under Miranda, when a suspect is in custody, not only express questioning, but also its "functional equivalent" is barred. Arizona v. Mauro, 481 U.S. 520, 526 (1987). The "functional equivalent" is defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301. In addition, "'[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining' what the police reasonably should have known." Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990), quoting Innis at 302.

There is, however, a "routine booking question" exception to the bar against custodial interrogation, under which "questions to secure the 'biographical data necessary to complete booking or pretrial services'" normally attendant to the booking process are not considered interrogation. Muniz, at 601, citing United States

12

v. Horton, 873 F.2d 180, 181, n. 2 (8th Cir. 1989)(Questions regarding defendant's name, address, height, weight, eye color, date of birth, and current age fall within the booking exception). The Eighth Circuit has stated:

> "[B]ackground questions rarely elicit an incriminating response." United States v. Mata-Abundiz, 717 F.2d 1277, 1280 (9th Cir. 1983)(question regarding citizenship held interrogation), citing United States v. Booth, 669 F.2d 1231, 1238 (9th Cir. 1981). If, however, the questions are reasonably likely to elicit an incriminating response in a particular situation, the [booking] exception does not apply." United States v. Mata-Abundiz, 717 F.2d at 1280; see Pennsylvania v. Muniz, 496 U.S. at 602, n. 14. The test is an objective one, although the subjective intent of the questioning agent is relevant. United States v. Mata-Abundiz, 717 F.2d at 1280. In addition, the relationship of the question asked to the crime suspected is considered highly relevant. Id.

United States v. Reyes, 908 F2d 281, 293 (8th Cir. 1990), cert. denied, 499 U.S. 908 (1991).

Other than "Is this your uncle?", it is difficult to understand how any of the above questions or conversation can be described as seeking "biographical" information.[6] Rather, they clearly are inquiries about the defendant's knowledge of the facts giving rise to his and his uncle's arrests. Whether Jayro

---

[6] Had the investigator asked, he might have learned some biographical information which might have "concern[ed] [any] unusual susceptibility of [this] defendant to a particular form of persuasion." Muniz, supra, at 601. There is no evidence of whether the investigator knew or should have known that there were any such factors in play in this conversation, such as defendant's young age (18) and the fact that he had no prior criminal record. Those facts were part of the "collective knowledge" of the state patrol, however, as they were given to Trooper Hazard by dispatch during the traffic stop. It is unnecessary to reach this issue in the circumstances here.

knew why he was arrested elicited a response that could be interpreted as "guilty knowledge." Whether he knew who owned the car elicited his knowledge about the overall trip or scheme. Whether he knew the person who owned the car elicited information that could tie him to the overall scheme and purpose of the travel. These questions could reasonably be expected to seek incriminating responses disclosing information well beyond the biographical information commonly gathered in the booking process. As such, they constituted unwarned custodial "interrogation" under <u>Innis</u>, in violation of <u>Miranda</u>. All of the conversation after the question and answer giving Jayro's address should be suppressed.

In accordance with the foregoing,

IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. §636(b)(1)(B):

1. Defendant Julio Flores-Elenes's motion to suppress evidence, filing 28, be denied in all respects.

2. Defendant Jayro Fores's motion to suppress statements, filing 26, be granted.

The parties are notified that failure to object to this recommendation as provided in the local rules may result in a waiver of the right to appeal the district judge's adoption of findings in the recommendation.

FURTHER, IT HEREBY IS ORDERED: Trial of this matter is scheduled to begin at 9:00 a.m. on September 15, 2008 before the Hon. Richard G. Kopf, United States District Judge, and a jury. Jury selection will be held at commencement of trial. Trial is scheduled for a duration of three trial days. This trial setting is conditioned upon the prior disposition or continuance of <u>United States v. Brown</u>, 4:08CR3009; <u>United States v. Arriola</u>, 4:08CR3087; and <u>United States v. Mendibil and Bernal</u>, 4:08CR3095.

Dated July 28, 2008

BY THE COURT

s/ *David L. Piester*
United States Magistrate Judge